Memorandum of Decision
On June 11, 1999, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Alice R. and Jeremy B. to Clarines B., and to terminate the parental rights of Alice R. and Juan S. to Emely S. A consolidated trial of these petitions took place in this court on May 15, 2000. For the reasons stated below, the court now grants both termination petitions. CT Page 6007
FACTS
The court finds the following facts and credits the following evidence. The mother, Alice R., was born in 1973. She did not attend high school. Between 1989 and 1996, the mother had six children with four different fathers.
Clarines was born on July 16, 1994. She was the product of a short-lived relationship between the mother and Jeremy B. Jeremy B. was in prison at the time of Clarines's birth. Since November, 1995, when Clarines went into foster care, Jeremy B. has had no contact with her or with DCF. He did not appear at trial. Clarines has no relationship with or memories of her natural father.
Emely S. was born on November 26, 1995 to the mother and Juan S. The mother tested positive for cocaine at the time. DCF obtained an order of temporary custody and Clarines, Emely, and the mother's three other children went into foster care.
The mother has a poor record of compliance with court-ordered expectations and with voluntary service agreements with DCF. The mother received numerous services since 1995, including parent aides in 1995 and 1996 and in-home services in 1997 and 1998. The mother enrolled in several substance abuse treatment programs but, on January 27, 1999, she tested positive for cocaine. The mother and Juan also have a history of domestic violence through 1998. The mother until recently has not worked regularly.
Visits with her children took place at the mother's residence through 1998. The children would often return to their foster homes from visits with bruises that resulted from poor supervision by the mother. There were other incidents in which the mother left the children without any supervision or exhibited poor judgment by engaging in risky behavior with them.
The mother moved to a new apartment in August, 1999, with daughters Lila, age nine, and Karina, age three. The apartment is clean and neat. Juan S. does not live there and the mother reportedly no longer has a relationship with him. The mother has been going to family and parenting counseling at Catholic Family Services. Her attendance at a substance abuse program, however, has been more sporadic and, in January and February, 2000, she tested positive for Cannabinoid.[2] The mother testified at trial that she realizes that the children are doing well in their current placements but that she would at least like to visit with them regularly. CT Page 6008
Juan S. has a poor record of compliance with court expectations and service agreements with DCF. At an administrative case review in November, 1998, Juan stated that he had no interest in following court expectations. On January 30, 1999, he was arrested and found in possession of heroin. The court placed Juan in the community service labor program but he did not comply with the drug treatment component and several months later he was smoking marijuana. He did not appear at trial and his whereabouts are unknown.
Clarines has resided in the same foster home since her removal from her mother's care in 1995. In the foster home, Clarines began having tantrums or acting aggressively, especially after unsupervised visits with her natural mother. Based on these concerns, DCF began supervising the visits in early 1999. In July, 1999, the court ordered a complete cessation to the visits. At that time, a psychiatrist diagnosed Clarines as having oppositional defiant disorder and most likely post traumatic stress disorder. She is receiving medication and therapy.
Clarines does not refer to Alice R. as her mother and does not wish to visit with her. Clarines still exhibits difficult behaviors but has a close emotional attachment to her foster parents, who have provided Clarines the structure she needs. The foster parents are interested in adopting Clarines.
In August, 1996, after several short-lived placements, DCF placed Emely in the foster home where she has remained to the current time. She is developmentally on target. Emely has no relationship with her natural father and has no emotional bond with her natural mother. Because of Emely's adverse reactions to visits with her mother, the court terminated visitation in August, 1999. Emely's behavior in the foster home improved thereafter. Emely has developed a strong, positive attachment to her foster parents, whom she calls "Mommy" and "Papi." The foster parents are deeply committed to Emely and would like to adopt her.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of CT Page 6009 section 17a-110 or section 17a-111b [dealing with commitment extension hearings and permanency planning for committed children] that such efforts are not appropriate." In this case, the juvenile court found on January 21, 1999, that further efforts to reunify are not appropriate. Accordingly, the first requirement of the termination statute has been met.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Because there were no amendments in this case, the adjudicatory date is June 11, 1999, the date of filing of the original petitions. The petitions allege the grounds of abandonment and lack of an ongoing parent-child relationship against Jeremy B., failure to rehabilitate against Juan S., failure to rehabilitate against the mother with regard to both children, and lack of an ongoing parent-child relationship against the mother with regard to Clarines. The court finds that DCF has proven all grounds alleged by clear and convincing evidence.
The court disposes summarily of the grounds against Jeremy B. He has had no relationship or even contact with Clarines B. for at least the last four and one-half years. Accordingly, the court finds that he has abandoned Clarines "in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child," General Statutes § 17a-112 (c)(3)(A), and that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D).
2. Failure to Rehabilitate
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a CT Page 6010 reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated the girls neglected on January 25, 1996, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). The statute requires the court to analyze the parent's rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require a parent to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Measured by these standards, both the mother and Juan S. clearly failed to rehabilitate. They both have poor records of compliance with court expectations and service agreements. Furthermore, they did not benefit from the programs that they did attend. Despite the provision of programs and services for several years, the parents continued to use drugs, engage in domestic violence, and, particularly in the mother's case, exhibit poor parenting skills during the adjudicatory period. Finally, the mother and Juan S. have little or no relationship with their children. DCF has accordingly proven failure to rehabilitate by clear and convincing evidence.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever CT Page 6011 developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced."In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290
(1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
Clarines reacted adversely to unsupervised visits with her mother and no longer wishes to visit with her. She does not refer to Alice R. as her mother. Clarines is instead strongly attached to her foster parents, with whom she has lived for the last three and one-half years of the adjudicatory period. Based on these facts, the court finds by clear and convincing evidence that there was no ongoing parent-child relationship between Clarines and her mother during the adjudicatory period.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book §33-5.
Under these standards, the parental rights of the two fathers in this case should obviously be terminated. Jeremy B. is a complete stranger to Clarines. Juan S. failed to rehabilitate despite being given ample opportunity to do so, has no relationship with Emely, did not appear for trial, and has not recently been seen.
The mother at least appeared at trial and expressed an interest in visiting with her children. But she has failed to rehabilitate, even after the adjudicatory period, and does not have a mother-daughter relationship with her children. The girls are instead bonded to their foster parents, with whom they have lived in stability for most of their childhood. Termination of parental rights and subsequent adoption would allow these girls to remain in the homes where they feel secure for the rest of their childhood. Such a disposition would leave the issue of visitation in the discretion of the foster parents. The court trusts that the foster parents will exercise this discretion wisely.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is CT Page 6012 a prerequisite. See In re Eden F., 250 Conn. 674, 691, 741 A.2d 873
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Over a nine year period, DCF referred the mother to some ten different agencies for a variety of social services. DCF referred Juan S. to two agencies for substance abuse and domestic violence counseling. These services were offered in time for the parents to benefit from them and begin reunification. DCF did not offer Jeremy B. any services because he was incarcerated and then disappeared.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
In January, 1996, the court entered the following expectations for the mother and Juan S. to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in counseling and drug screening, 5) cooperate with family preservation, 6) secure and maintain adequate housing and income, 7) no substance abuse, 8) refrain from domestic violence, and 9) accompany children on medical appointments. As stated, the mother and Juan S. performed poorly in meeting these expectations. The court did not enter expectations or specific steps for Jeremy B., presumably because he did not attend court.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The children are strongly attached to their foster parents. The girls have no relationship with their respective fathers. They apparently recognize Alice R., but they have no emotional ties to her. CT Page 6013
5) The age of the child.
Clarines is almost six years old. Emely is four and one-half years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in the children's best interest to return to their home. The mother did have regular visits with Clarines and Emely through mid-1999, but the girls reacted adversely to them.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances. The mother and Juan S. did engage in domestic violence but they did not take timely advantage of measures such as counseling or restraining orders to address this problem.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petitions. The Commissioner of DCF is hereby appointed statutory parent for the children for the purpose of securing adoptive families. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
 Carl J. Schuman Judge, Superior Court
CT Page 6014